ELLIS GEORGE LLP
Matthew L. Venezia (State Bar No. 313812)
    mvenezia@ellisgeorge.com
George B. A. Laiolo (State Bar No. 329850)
    glaiolo@ellisgeorge.com
Andrew R. Iglesias (State Bar No. 348791)
    aiglesias@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff
GREGORY ROWE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GREGORY ROWE, | Case No. 2:24-cv-05022 |
| Plaintiff, | Assigned Judge: |
| vs. | |
| UNITED NETWORK FOR ORGAN SHARING; UNIVERSITY OF SOUTHERN CALIFORNIA, | **COMPLAINT FOR:** |
| Defendant. | **(1) VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964;** |
| | **(2) VIOLATION OF THE UNRUH CIVIL RIGHTS ACT [CALIFORNIA CIVIL CODE § 51];** |
| | **(3) BREACH OF FIDUCIARY DUTY; AND** |
| | **(4) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW [CAL. BUS. & PROF. CODE § 17200 ET SEQ.]** |
| | **DEMAND FOR JURY TRIAL** |

2428834.2

Plaintiff Gregory Rowe ("Plaintiff") brings this Complaint individually, and on behalf of all persons similarly situated, against the University of Southern California (collectively "USC") and the United Network for Organ Sharing ("UNOS"), (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.     Black Americans are more than three times as likely to suffer from kidney failure when compared to White Americans. As a group, and as a result of ongoing racial inequality, Black Americans are at higher risk for maladies such as high blood pressure, obesity, diabetes, and heart disease, each of which increases the likelihood of suffering kidney disease.

2.     Despite being overrepresented when it comes to kidney disease, and overrepresented on the national waitlist for donor kidneys, Black Americans are much less likely than their White counterparts to actually receive a kidney transplant.

3.     Kidney function is measured by an estimated glomerular filtration rate test, commonly referred to as eGFR. A patient's eGFR score is used to determine when the patient is eligible to begin accruing wait time on the national kidney waitlist, with the score needing to fall below 20 ml/min to qualify a patient to begin accruing wait time.

4.     When a prevalent modern test to measure eGFR was developed, a few flawed studies indicated Black Americans had higher creatinine extraction rates, and instead of considering whether this difference could be caused by non-racial societal factors, it was postulated by the developers of the eGFR test that Black Americans' scores could be explained because Black Americans have more muscle mass and thus more creatinine in their systems than White Americans.

5.     Based on this postulation, the creators of the eGFR test added a race-based modifier to eGFR scores, known as the "race-based coefficient," which artificially inflates the scores of Black Americans by 16–18%. That is, eGFR is calculated irrespective of race, and then only for Black patients, the score is increased

by 16–18%, based upon the flawed premise that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodies.

6.     This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

7.     Indeed, the United Network for Organ Sharing ("UNOS") has now admitted as much, posting the following passage on its website:



**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population. The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

8.     This is important because eGFR scores are used to determine when a patient is eligible to begin accruing wait time on the national kidney waitlist, maintained by UNOS, and wait time is a key factor in determining which patient will be awarded a kidney, as kidneys become available. Again, for an eGFR score to qualify a patient with kidney disease to accrue wait time, the eGFR score must fall below 20 ml/min.

9.     However, application of the race-based coefficient artificially increased Black patients' eGFR scores above that threshold such that Black patients'

unmodified eGFR scores must have fallen well below 20 ml/min before they began accruing wait time.

10.     Indeed, because of the race-based coefficient, many Black patients never began to accrue wait time because of a qualifying eGFR score, but were instead delayed until such time as they were forced to begin dialysis, the other possible triggering factor for wait time, which is recommended when kidney function falls below 15 ml/min, or when certain symptoms of kidney disease present themselves.

11.     It is true that UNOS recently announced it was outlawing use of the race-based coefficient when measuring eGFR scores. UNOS's announcements rightly admit the discriminatory nature of their past policy, but will also prove too little too late for many Black Americans currently suffering kidney failure, and are ineffective to cure the discriminatory effects of UNOS's past policies.

12.     In this regard, UNOS announced its intent to change course and outlaw use of the race-based coefficient in June of 2022, but did nothing for more than six months to address the erroneous wait time calculations for Black Americans already on the national kidney waitlist.

13.     In January of 2023, UNOS instructed donor hospitals—like Defendant USC—to notify Black candidates of the policy change and investigate whether Black members of their donor lists were eligible for a wait time modification, but UNOS gave donor hospitals a year to complete this process, until January of 2024.

14.     Unfortunately, in the time between June of 2022 and January of 2024, tens of thousands of Black Americans were prejudiced in their candidacy for a donor kidney by use of erroneous wait time calculations, missing out on donor kidneys they rightfully should have been awarded, incurring significant economic losses, suffering from worsened kidney disease, and in some instances, dying.

15.     In other words, many Black Americans suffering from kidney disease did not have 18 months for UNOS to fix its wait time calculations, and during this period, Black Americans continued to suffer racial discrimination in the kidney

donation process, despite all involved admitting that the process was discriminatory to Black Americans.

16.    Moreover, UNOS's remedial actions were insufficient to correct all Black candidates' wait times. UNOS bragged that 14,849 wait time adjustments were completed, however, there are approximately 27,500 Black candidates on the national kidney waitlist. Moreover, UNOS did nothing to address Black kidney disease patients that were never added to the waitlist because of the race-based coefficient.

17.    Plaintiff Gregory Rowe is one such Black kidney disease patient to whom USC applied the race-based coefficient. In August of 2017, USC received and considered a lab test that showed Mr. Rowe had an eGFR score of 19 in the absence of the race-based coefficient. But because USC used the race-based coefficient when treating Black patients like Mr. Rowe, it classified Mr. Rowe as having an eGFR of 22.

18.    If USC had provided medical care without regard to Mr. Rowe's race, because Mr. Rowe's race-neutral eGFR score was below 20, USC would have referred him to UNOS for addition to the wait list. Mr. Rowe would have begun accruing wait time, and very likely would have received a donor kidney.

19.    But USC never referred Mr. Rowe to the wait list. Nor did USC disclose to Mr. Rowe that the race-based coefficient was applied to his eGFR score, or that his adjusted score was too high to be referred to the waitlist. USC never informed Mr. Rowe that he did not qualify to join the waitlist.

20.    To this day, despite Mr. Rowe's recent efforts to be added to UNOS's national kidney waitlist, it is unclear whether Mr. Rowe is currently even listed. Mr. Rowe has never received confirmation that he has been added to the list, or that he has received a wait time adjustment, and upon information and belief, Mr. Rowe alleges that he is not listed in UNet with a proper wait time calculation dating back to August of 2017.

21.    Mr. Rowe thus continues to suffer from kidney disease, and is need of a

kidney transplant. This kidney disease also causes Mr. Rowe significant emotional distress and does not allow Mr. Rowe gainful employment in sales management, where he has more than a decade of experience.

22.    New donor kidneys become available every day, and as the health of Black kidney patients deteriorates, the failure to properly calculate Black patients' wait time such that they can be fairly considered for kidneys as they become available jeopardizes their lives. Mr. Rowe brings this action on behalf of USC patients to whom USC applied the race-based coefficient to seek recourse for this intentional, racial discrimination.

23.    If UNOS had not allowed and encouraged the use of the race-based coefficient, USC would not have applied the race-based coefficient to Mr. Rowe and other Black patients. Moreover, USC has acted as UNOS's agent in implementing the discriminatory policy by acting as a gatekeeper for Black patients like Mr. Rowe seeking to be added to the national kidney waitlist.

## PARTIES

24.    Plaintiff Gregory Rowe is an individual residing in Los Angeles, California.

25.    Plaintiff is informed and believes, and alleges, that Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

26.    Plaintiff is informed and believes, and thereon alleges, that Defendant USC is a California nonprofit corporation with its principal place of business in Los Angeles, California.

27.    Plaintiff is informed and believes, and alleges, that Defendant USC owns and operates Keck Medicine of USC, a hospital, which is not a separate legal entity.

28.    USC and UNOS act jointly in implementing the race-based coefficient, with USC acting as UNOS's agent, because kidney disease patients must be referred to the national kidney waitlist by one of UNOS's approved partner transplant

hospitals, like USC. UNOS set up the national kidney transplant list in this manner, and does not allow patients to apply for inclusion on the waitlist by themselves.

## JURISDICTION AND VENUE

29.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343 because Plaintiff asserts a federal cause of action alleging racial discrimination, and because, upon information and belief, at least one member of the putative classes defined hereinafter is a citizen of a different state than all Defendants, and the amount in controversy exceeds $5,000,000. This Court further has supplemental jurisdiction over any state-law claims pursuant to 28 U.S.C. § 1367.

30.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this District and has been affected by Defendants' unlawful policies and procedures within the District, USC's principal place of business is within this District, and USC's alleged actions have occurred within the District. Defendants also apply their unlawful policies and procedures to additional putative class members residing within the District. Thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

31.    This Court has personal jurisdiction over UNOS because UNOS conducts operations within California by virtue of its management of the kidney donor list for all patients residing within the State, including Plaintiff. UNOS makes decisions as to which patients residing in California will be offered donor kidneys.

32.    This Court has personal jurisdiction over USC because USC maintains its principal place of business within the State, and harmed Plaintiff by virtue of the unlawful conduct alleged herein within this State.

## GENERAL ALLEGATIONS

A.    **The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys**.

33.     In 1984, Congress passed the National Organ Transplant Act, creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Under the Act, this registry was to be operated by a private, non-profit organization under Federal contract.[1]

34.     Since that time, UNOS has acted as that private, non-profit organization, and per its website, UNOS "[m]anag[es] the national transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy about how donor kidneys will be awarded to patients with kidney disease.

35.     To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals, and receive a referral from their physician. In this way, the transplant hospitals, like USC, serve as a gatekeeper to patients seeking to be placed on the national kidney waitlist.

36.     UNOS must approve these transplant hospitals before they are eligible to refer patients to the kidney transplant waitlist. Hospitals like USC must agree to be bound by UNOS's published policies and procedures to act as a transplant hospital.

37.     USC serves as UNOS's agent in dealing with kidney disease patients. That is, UNOS is contractually obligated to manage the national kidney waitlist, but does not allow kidney disease patients to apply for inclusion on the kidney transplant waitlist directly through UNOS. Again, kidney disease patients must be referred by an approved transplant hospital. Thus, if a transplant hospital, purporting to apply and follow UNOS's required policies, fails to refer a patient to UNOS's waitlist, the patient has no recourse.

38.     The national kidney transplant waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR

---

[1] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

scores, into the UNet software, which tracks patient medical information and wait time.

39.    Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, and generates a list of potential matches, ranking potential matches on the national kidney waiting list. This ranked list is known as a match run. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

40.    In the UNet algorithm, qualifying wait time is worth 1/365 points per day, or one point per year. These wait time points are a significant factor in determining candidates' ranking in UNet's match runs, and ultimately which candidate will be awarded any particular kidney.

41.    Indeed, because all other factors for which candidates are assigned points are race-neutral, wait time acts as a sort of tie breaker between similarly situated Black and non-Black candidates. From the point the race-based coefficient was first applied, until their wait-times were adjusted to eliminate consideration of race, Black candidates accrued less wait time than similarly situated non-Black candidates. Non-Black candidates therefore appeared higher in match runs, and were awarded kidneys first.

42.    Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. To accrue qualifying wait time, generally a patient's eGFR score must either fall below 20 ml/min, or the patient must begin dialysis.

**B.    <u>The Defendants applied a racially discriminatory coefficient to eGFR scores for Black patients</u>**.

43.    UNOS is responsible for enacting policy concerning the selection of which patients receive which donor kidneys. In this regard, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

44.    For decades, the race-based coefficient was applied to artificially inflate

9

eGFR scores for Black Americans, overstating their kidney function by 16–18%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their system.

45.    As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient was applied to artificially inflate the Black patients' eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

46.    UNOS policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants. Specifically, UNOS is and has at all times been aware that its approved transplant hospitals were using the race-based coefficient to adjust Black kidney disease patients' eGFR scores, and making waitlist referral decisions relying upon the adjusted scores.

47.    UNOS further is and has at all times been aware that its UNet software includes an algorithm that uses wait time as a significant factor in ranking patients for donor kidneys, and that its UNet software includes wait times for Black patients that have been manipulated by use of the race-based coefficient. To be clear, this modification was made to Black patients' eGFR scores entirely because of their race, and was not applied to other racial groups.

48.    There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

49.    Years before UNOS took any action to review its policy allowing for use of the race-based coefficient, the practice was criticized by doctors for its racially

10

COMPLAINT

discriminatory nature. For example, in November of 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice, explaining that when she attempts to explain the policy to Black patients, she "get[s] a snort of disbelief[,]" and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."[2]

50.    Use of the race-based coefficient seriously diminishes Black patients' chances to receive a donor kidney. Indeed, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis. Some Black patients are never even added to the waitlist at all.

51.    All other factors being equal, the above-described practices have resulted in non-Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

52.    The failure to receive donor kidneys has caused significant harm to Black Americans. The unfortunate reality is that many Black Americans have already passed away that would have survived if given fair consideration for a donor kidney.

53.    Other Black Americans have suffered worsened kidney disease and/or been forced to go on dialysis because of the lengthened wait time for a donor kidney. These Black Americans have suffered economic damages in the form of medical expenses and lost wages.

**C.    Even after UNOS admitted the race-based coefficient discriminates against Black Americans, Defendants failed to timely address the problem**.

54.    In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require

---

[2] To be clear, Mr. Rowe never read this article, nor did any of doctors ever disclose the use of the race-based coefficient, until 2023.

transcript hospitals to use a race-neutral calculation when estimating a patient's level
of kidney function." In its press release, UNOS explained that

> For a number of years, some eGFR calculations have
> included a modifier for patients identified as Black. This
> practice has led to a systemic underestimation of kidney
> disease severity for many Black patients. Specifically in
> organ transplantation, it may have negatively affected the
> timing of transplant listing or the date at which candidates
> qualify to begin waiting time for a transplant.[3]

55.    UNOS policy officially changed on July 27, 2022, with UNOS policy
prior to that time expressly allowing for use of the race-based coefficient to artificially
increase Black patients' eGFR scores.

56.    Nonetheless, UNOS continued to use the race-based coefficient as a
default. For more than six months, UNOS took no affirmative steps to adjust wait
times and correct for previous use of the race-based coefficient.

57.    On January 5, 2023, UNOS announced a new policy that would require
donor hospitals to provide two notifications to patients on the national kidney waitlist,
one notifying patients that Black Americans will be considered for wait time
adjustments where the race-based coefficient delayed their accrual of wait item, and
a second notification confirming this process was completed and informing patients
of their status. UNOS also directed donor hospitals to investigate which patients are
eligible for a wait time adjustment, and request said adjustments within a year, i.e.,
by January of 2024.

58.    While this adjustment in policy rightfully acknowledges the problem, it
lacked required urgency and depth. For the approximately 27,500 Black Americans
on the national kidney waitlist, the policy change was too little too late. UNOS's
policy concerning the race-based coefficient to eGFR scores was racially
discriminatory before UNOS ever acknowledged the problem, and rather than making
immediate changes, UNOS allowed member transplant hospitals approximately 18

---

[3] This Press release is publicly available at https://unos.org/news/optn-board-
approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

1   months to identify and attempt to correct falsely-calculated wait times.

2      59.    During this period, Black Americans continued to suffer a race-based

3   disadvantage in their candidacy for a donor kidney—UNet continuing to use the old,

4   improperly calculated wait times when awarding kidneys.

5      60.    UNOS ultimately failed to process wait-time adjustments as promised.

6   As of January 15, 2024, UNOS had completed only 14,849 wait-time adjustments

7   where there are approximately 27,500 Black Americans currently on the waitlist.

8      61.    Moreover, for those Black kidney disease patients that were not referred

9   to the waitlist when they would have qualified to begin accruing wait time, like Mr.

10  Rowe, the policy change did nothing. He was not placed on the waitlist by USC, and

11  still awaits confirmation that he has been added to the list by any transplant hospital.

12  **D.    Plaintiff has been discriminated against by the race-based**

13  **coefficient to eGFR scores for years, and has never been awarded a**

14  **kidney**.

15     62.    Plaintiff first discovered that he suffered from kidney disease in

16  approximately 2008, while receiving medical treatment at Olive View Hospital in the

17  San Fernando Valley.

18     63.    Having been diagnosed with kidney disease, Plaintiff underwent regular

19  testing of his eGFR to determine his kidney function. Upon information and belief, at

20  all times the race-based coefficient was used to artificially inflate Plaintiff's eGFR

21  scores.

22     64.    Plaintiff's artificially inflated eGFR scores first qualified Plaintiff to

23  begin accruing wait time on the national kidney waitlist in August of 2017. At this

24  time, Plaintiff's non-modified eGFR score fell below 20 ml/min, as is required to

25  begin to accrue wait time.

26     65.    USC, as Plaintiff's transplant hospital, was in possession of this lab test,

27  but failed to refer Mr. Rowe to UNOS's national kidney waitlist. Had Plaintiff's eGFR

28

score not been adjusted, he would have qualified to be referred to the national kidney waitlist at this time.

66.     Accordingly, but for use of the race-based coefficient, Plaintiff would have begun to accrue wait time in approximately August of 2017, entitling Plaintiff to a spot on the kidney wait list, the chance to begin accruing wait time, and to eventually receive a donor kidney.

67.     To be clear, USC never informed Plaintiff that the race-based coefficient was used to adjust his eGFR score, nor did USC seek Plaintiff's inclusion on the waitlist to have UNOS reject the request. The race-based coefficient was applied secretly, no referral was made, and the decision to not refer was never discussed with Plaintiff.

68.     Plaintiff first learned of the race-based coefficient in 2023, shortly after the filing of *Randall v. UNOS et al.*, Case No. 2:23-cv-02576, before Judge Frimpong in the Central District of California. Specifically, Plaintiff saw press coverage of that lawsuit and began to investigate the issue.

69.     After assembling his medical records and seeking legal advice, Plaintiff learned of the August 2017 lab test, and that but for use of the race-based coefficient should have qualified him to join the national kidney waitlist. Now realizing that USC had racially discriminated against him, Plaintiff visited Cedars-Sinai Medical Center ("Cedars-Sinai"), another approved transplant hospital, in hopes of being added to the national kidney waitlist.

70.     Despite presenting his qualifying lab score to Cedars-Sinai more than a year ago, Plaintiff never received confirmation that he was placed on the national kidney waitlist, nor that his wait time was adjusted to begin in August of 2017. Plaintiff thus pleads, upon information and belief, that he is not currently a member of the national kidney waitlist.

/ / /

/ / /

**E.** **As a result of not being awarded a kidney in the transplant market, Plaintiff has suffered significant economic harms**.

71.    Since his diagnosis and application of the race-based coefficient, Mr. Rowe's kidney disease has progressed, and Mr. Rowe remains in need of a kidney transplant. He has also suffered various fall-on health problems, necessitating significant medical expenses, experienced severe emotional distress, and has been unable to work.

## CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action on behalf of himself and the below-defined putative classes who are similarly situated under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

73.    The USC Class seeks damages and is defined as follows:

- All patients identified as Black who received medical treatment at USC, and for whom the accrual of wait time on the national kidney waitlist was delayed or prevented by application of the race-based coefficient. This class excludes those patients pursuing personal injury or wrongful death claims.

74.    Upon information and belief, USC added at least 500 Black patients to the national kidney waitlist whose eGFR scores were calculated using the race-based coefficient. Because many Black patients, like Plaintiff, were never added to the wait list because their race-based-coefficient-tainted eGFR fell outside the qualifying range, the size of the putative USC Class is even higher.

75.    The identities of the members of the USC Class are known or readily ascertainable by UNOS and USC, and the number of persons who fall within the definition of this class are so numerous and geographically dispersed as to make joinder of all members of the USC Class in their individual capacity impracticable, inefficient, and unmanageable so as to effectively deny each putative member of these classes his, her, or their right to obtain relief based on the claims and allegations made in this Complaint.

76.    There are common questions of law and fact as to the USC Class, relating to and/or dispositive of the allegations of unlawful and misleading conduct made in the Complaint, and relating to and/or dispositive of the common pattern of alleged injury and harm caused by that unlawful and misleading conduct and sustained by the putative members of the classes, including, but not limited to:

- Whether UNOS discriminated against members of the class on account of their race by encouraging and allowing for use of the race-based coefficient;

- Whether UNOS discriminated against members of the classes on account of their race by its knowing use of manipulated wait time data in the UNet algorithm;

- Whether UNOS's UNet algorithm was racially biased and led to delay for Black candidates seeking donor kidneys;

- Whether the disparate impact of UNOS's policy allowing for use of the race-based coefficient and the UNet algorithm was known to UNOS during the relevant time period, leading to the uniform disparate treatment of members of the classes;

- UNOS's knowledge of their practices and the discriminatory impact on the classes;

- Whether USC discriminated against members of the USC Class on account of their race by encouraging and allowing for use of the race-based coefficient;

- Whether USC discriminated against members of the USC Class on account of their race by its failure to provide accurate wait time data for inclusion in UNet, or refer eligible patients for inclusion on the waitlist;

- Whether USC's failure to provide accurate wait time data for inclusion in UNet was racially biased and led to delay for Black candidates seeking donor kidneys;

- USC's knowledge of their practices and the discriminatory impact on the USC Class;

- Whether USC owes its patients on the kidney waitlist a fiduciary duty, and whether USC's failure to provide accurate wait time information for use in UNet, or failure to refer to the waitlist, violated such a duty; and

- The length of the delay caused by use of the race-based coefficient and increased medical costs resulting therefrom.

77.    The interests of Plaintiff and the classes are aligned. Plaintiff seeks to establish that UNOS and USC are liable for economic injuries caused to Black

patients by application the race-based coefficient. Should Plaintiff prevail in establishing the same, each of the other members of the class would then be entitled to recover damages in compensation for their economic injuries.

78.     The claims of Plaintiff are typical of the claims of the members of the classes. Plaintiff is a Black USC patient, whose referral to the UNOS waitlist and accrual of wait time was prevented because of the use of the race-based coefficient, residing in California.

79.     Plaintiff's claims are typical of the other members of the classes because all class members were injured as a result of substantially similar conduct by UNOS and USC.

80.     Plaintiff is an adequate class representative because his interests do not conflict with the interests of the other members of the classes. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

81.     The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications.

82.     The questions of law and fact common to the members of the classes predominate over any questions of law or fact affecting only individual members of the classes. The primary claims to be proven in this case relate to whether UNOS and USC engaged in actionable discriminatory behavior by virtue of their use of the race-based coefficient and manipulated wait times in the formula to determine which patient receives a donor kidney. The types of damages suffered by class members, such as increased medical costs, are uniform and can be calculated on a class-wide basis, or in the alternative, compensated with statutory damages. These issues predominate over any individual issues, of which there appear to be few if any.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a

large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Prosecution as a class action will eliminate the need for repetitious litigation—if it were even feasible for each member of the class to proceed individually.

84.    Plaintiff is aware of any similar cases filed against UNOS: *Randall v. UNOS*, No. 2:23-cv-0257 (C.D. Cal.); *Holt v. UNOS*, No. 1:24-cv-01599 (N.D. Ga.); *Welch v. UNOS*, No. 3:24-cv-00422.

85.    California is a proper and desirable forum for the claims against UNOS and USC to proceed. UNOS maintains the national kidney waitlist, but more than 23,000 members of that waitlist reside in California, a significant percentage of all members of the waitlist. Moreover, USC and Plaintiff are both located in California, and most of the members of the class are located in California.

86.    The class is readily definable by review of medical records that should exist in the files of UNOS and USC. Moreover, UNOS and USC should have records of the email addresses, phone numbers, and addresses of members of the USC Class such that providing notice to the class will be practicable. Thus, there does not exist any significant likely difficulties in managing the claims as a class action.

## **FIRST CAUSE OF ACTION**

### **(Violation of Title VI of the Civil Rights Act of 1964)**

87.    Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

88.    This cause of action is brought by Plaintiff and the USC Class against UNOS and USC.

89.    UNOS receives significant financial assistance from the Federal government. Approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS.

90.    These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

91.    UNOS and USC have engaged in racial discrimination. As alleged in detail above, UNOS allowed and encouraged use of the race-based coefficient to artificially inflate Black patients' eGFR scores, thus delaying their accrual of wait time, and prejudicing their chances of receiving a donor kidney.

92.    UNOS used its approved transplant hospitals like USC as its agents when dealing with kidney disease patients seeking inclusion on the national kidney waitlist. That is, patients cannot apply directly through UNOS to be added to the waitlist, and UNOS thus uses the transplant hospitals as agents to assist with UNOS's management of the national kidney waitlist. Accordingly, When transplant hospitals like USC used the race-based coefficient as the reason to not refer a Black patient to the national kidney waitlist, like is the case with Plaintiff, they did so as an agent of UNOS, bound to follow UNOS's required policies and procedures.

93.    UNOS further knowingly used modified wait times for Black patients in its UNet software, causing Black patients to be ranked lower for specific donor kidneys vis-à-vis members of other races. Even after admitting the practice was racially discriminatory, UNOS failed to take prompt action to ensure Black patients' wait times were recalculated.

94.    Upon information and belief, USC receives significant financial assistance from the federal government and its programs, funding both patient care and related operations.

95.    USC has engaged in racial discrimination. As alleged in detail above, USC used the race-based coefficient when measuring Black patients' eGFR scores, thus delaying or preventing their accrual of wait time, and prejudicing their chances of receiving a donor kidney. As to Plaintiff and others, USC used race-based coefficient-altered eGFR scores in deciding not to refer Black patients to the waitlist.

96. USC further knowingly provided race-based-coefficient-tainted data to UNOS, which incorporated the data in its UNet software, causing Black patients to be ranked lower for specific donor kidneys vis-à-vis members of other races.

97. The above-described racial discrimination damaged Plaintiff and members of the USC Class by depriving and/or delaying their award of a donor kidney. This has caused Plaintiff and members of the USC Class to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs.

## SECOND CAUSE OF ACTION

### (Violation of the Unruh Civil Rights Act [California Civil Code § 51])

98. Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

99. This cause of action is brought by Plaintiff and members of the USC Class against UNOS and USC.

100. Both UNOS and USC are "business establishments" as defined by the Unruh Civil Rights Act. UNOS has an office, and numerous employees. UNOS receives a fee for each patient that is registered on the waitlist, collected by its agent transplant hospitals, and then remitted to UNOS. UNOS also receives substantial revenue because of its contract with the federal government, and has a permanent office and numerous employees. USC also has numerous offices, numerous employees, and charges its patients in exchange for medical services.

101. UNOS and USC have engaged in racial discrimination. As alleged in detail above, UNOS allowed and encouraged use of the race-based coefficient to artificially inflate Black patients' eGFR scores, thus delaying their accrual of wait time, and prejudicing their chances of receiving a donor kidney.

102. UNOS used its approved transplant hospitals like USC as its agents when dealing with kidney disease patients seeking inclusion on the national kidney waitlist. That is, patients cannot apply directly through UNOS to be added to the waitlist, and UNOS thus uses the transplant hospitals as agents to assist with UNOS's management

of the national kidney waitlist. Accordingly, When transplant hospitals like USC used the race-based coefficient as the reason to not refer a Black patient to the national kidney waitlist, like is the case with Plaintiff, they did so as an agent of UNOS, bound to follow UNOS's required policies and procedures.

103.   UNOS further knowingly used modified wait times for Black patients in its UNet software, causing Black patients to be ranked lower for specific donor kidneys vis-à-vis members of other races. Even after admitting the practice was racially discriminatory, UNOS failed to take prompt action to ensure Black patients' wait times were recalculated.

104.   USC has engaged in racial discrimination. As alleged in detail above, USC used the race-based coefficient when measuring Black patients' eGFR scores, thus delaying or preventing their accrual of wait time, and prejudicing their chances of receiving a donor kidney. As to Plaintiff and others, USC used race-based coefficient-altered eGFR scores in deciding not to refer Black patients to the waitlist.

105.   USC further knowingly provides race-based-coefficient-tainted data to UNOS, which incorporated the data in its UNet software, causing Black patients to be ranked lower for specific donor kidneys vis-à-vis members of other races.

106.   The above-described racial discrimination damaged Plaintiff and members of the USC Class and California No-Waitlist Class by depriving and/or delaying their award of a donor kidney. This has caused Plaintiff and members of the USC Class to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs.

107.   Both USC and the members of the USC Class are located within California.

108.   The above-described racial discrimination damaged Plaintiff and members of the USC Class by depriving and/or delaying their award of a donor kidney. This has caused Plaintiff and members of the USC Class to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty)

109.  Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

110.  This cause of action is brought by Plaintiff and members of the USC Class against USC.

111.  As the transplant hospital for Plaintiff and members of the USC Class, USC owed Plaintiff and members of the USC Class a fiduciary duty.

112.  USC breached its fiduciary duty by engaging in racial discrimination against its fiduciaries.

113.  USC breached its fiduciary duty by knowingly submitting eGFR scores tainted by use of the race-based coefficient to UNOS for inclusion in its UNet algorithm, prejudicing its own Black patients' chances of receiving a donor kidney, and failing to register qualifying individuals like Plaintiff on the waitlist.

114.  The above-described breaches of fiduciary duty damaged Plaintiff and members of the USC Class by depriving and/or delaying their award of a donor kidney. This has caused Plaintiff and members of the USC Class to incur economic injuries, including, but not limited to, continued medical costs such as dialysis costs.

## FOURTH CAUSE OF ACTION

### (Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.])

115.  Plaintiff re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth in the paragraphs above.

116.  This cause of action is brought by Plaintiff and members of the USC Class against UNOS and USC.

117.  UNOS and USC have committed acts of unfair competition, as defined by California Business and Professions Code § 17200, by engaging in the unlawful and discriminatory practices described above. Without limitation, UNOS and USC

1 have discriminated against Black patients by their use of the race-based coefficient,

2 which fails to give Black patients credit for the appropriate amount of wait time.

3   118. This failure to properly calculate wait time has harmed Plaintiff and the

4 USC Class, because their chances of receiving a donor kidney have been lessened.

5 Indeed, as alleged above, on information and belief, Plaintiff was deprived of a donor

6 kidney because UNOS allowed and encouraged, and USC used, a wait time

7 calculation tainted by application of the race-based coefficient.

8   119. Plaintiff and the majority of the members of the USC Class all reside in

9 California, and the discrimination against these persons occurred in California. USC

10 is also located in California, and its alleged discriminatory conduct occurred in

11 California.

12   120. Plaintiff and the members of the USC Class are without an adequate

13 remedy at law.

14 **PRAYER FOR RELIEF**

15   WHEREFORE, Plaintiff and the putative USC Class pray for relief against

16 UNOS and USC as follows:

17   1. For preliminary and injunctive relief against the discriminatory conduct

18 alleged herein;

19   2. For damages in compensation for the economic injuries suffered by

20 Plaintiff and the USC Class, in an amount to be determined by evidence, but in excess

21 of $5 million;

22   3. For statutory damages and treble damages as allowed by the Unruh Act;

23   4. For punitive damages in an amount according to proof;

24   5. For prejudgment interest on all damages awarded by this Court;

25   6. For reasonable attorneys' fees and costs of suit incurred herein; and

26   7. For such other and further relief as the Court deems just and proper.

27 / / /

28 / / /

1    Dated:  June 13, 2024                    ELLIS GEORGE LLP

2                                                        Matthew L. Venezia
                                                          George B. A. Laiolo
3                                                        Andrew R. Iglesias

4
                                                    By:  _____/s/ Matthew L. Venezia_____
5                                                               Matthew L. Venezia
                                                 Attorneys for Plaintiff Gregory Rowe
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  June 13, 2024                    ELLIS GEORGE LLP
                                                        Matthew L. Venezia
                                                        George B. A. Laiolo
                                                        Andrew R. Iglesias


                                         By:  _____ *s/ Matthew L. Venezia* _____
                                                        Matthew L. Venezia
                                         Attorneys for Plaintiff Gregory Rowe

25

COMPLAINT