ELLIS GEORGE LLP
Matthew L. Venezia (State Bar No. 313812)
mvenezia@ellisgeorge.com
George B. A. Laiolo (State Bar No. 329850)
glaiolo@ellisgeorge.com
Daniel A. Contreras (State Bar No. 329632)
dcontreras@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiff
GREGORY ROWE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

GREGORY ROWE,

Plaintiff,

vs.

UNITED NETWORK FOR ORGAN SHARING; UNIVERSITY OF SOUTHERN CALIFORNIA,

Defendants.

Case No. 2:24-cv-05022-MEMF (MAAx)

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: May 28, 2026
Time: 10:00 a.m.
Ctrm.: 8B – 8th Floor
Judge: Maame Ewusi-Mensah Frimpong

FPTC Date: December 23, 2026
Trial Date: January 11, 2027

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 10

II. STATEMENT OF FACTS ..... 10

A. Nephrologists create the race-based coefficient, relying on the stereotype that Black people have bigger muscles. ..... 10

B. Defendants intentionally discriminated against Black patients for decades by using the race-based coefficient. ..... 12

C. Defendants admit the discriminatory nature of the race-based coefficient and ban its use. ..... 13

D. UNOS requires transplant hospitals to review records and submit wait time adjustments for impacted patients. ..... 14

E. Defendants' use of the race-based coefficient harmed Black patients. ..... 15

F. The Named Plaintiff. ..... 15

G. The Plaintiffs' Claims. ..... 16

H. The Proposed Class. ..... 17

III. ARGUMENT ..... 17

A. Legal Standard ..... 17

B. Plaintiff satisfies Rule 23(a). ..... 17

1. Numerosity. ..... 18

2. Commonality. ..... 19

3. Typicality. ..... 19

4. Adequacy. ..... 20

5. Ascertainability. ..... 21

C. Plaintiff satisfies Rule 23(b)(3). ..... 21

1. Common questions of fact and law predominate. ..... 21

a. Liability ..... 22

b. Damages ..... 24

2. A class action is superior to other available methods of adjudication. ..... 26

## TABLE OF CONTENTS
**(Continued)**

**Page**

D. The Court should appoint Mr. Venezia as lead class counsel. .....26

IV. CONCLUSION .....27

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*A. B. v. Hawaii State Dep't of Educ.*,
30 F.4th 828 (9th Cir. 2022)....20

*Alcantar v. Hobart Serv.*,
800 F.3d 1047 (9th Cir. 2015)....17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)....17

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017)....21

*Broomfield v. Craft Brew All., Inc.*,
2018 WL 4952519 (N.D. Cal. Sept. 25, 2018)....24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....10, 17, 24, 25

*Davis v. Lab. Corp. of Am. Holdings*,
2022 WL 22855520 (C.D. Cal. June 13, 2022)....10, 25

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012)....19, 23

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)....20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....22

*Gen. Tel. Co. v. EEOC*,
446 U.S. 318 (1980)....18

*Gratz v. Bollinger*,
539 U.S. 244 (2003)....10, 18

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*,
742 F.3d 414 (9th Cir. 2014)....23

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)....19, 20, 26

*Ingram v. The Coca-Cola Co.*,
200 F.R.D. 685 (N.D. Ga. 2001)....23

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014)....24

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Johnson v. City of Grants Pass*,
72 F.4th 868 (9th Cir. 2023), rev'd on other grounds, 144 S. Ct. 679 ....................................18

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017)....................................................................................24

*Keegan v. Am. Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Cal. 2012) ...............................................................................18

*Leyva v. Medline Industries Inc.*,
716 F.3d 510 (9th Cir. 2013)......................................................................................24

*Local 2507, Uniformed EMTs . . . v. City of New York . . .*,
2024 WL 4276495 (S.D.N.Y. Sep. 24, 2024) .............................................................23

*Lozano v. AT & T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007)......................................................................................20

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024)....................................................................................24

*Milan v. Clif Bar & Co.*,
340 F.R.D. 591 (N.D. Cal. 2021) ...............................................................................17

*Nevarez v. Forty Niners Football Co., LLC*,
326 F.R.D. 562 (N.D. Cal. 2018) ...............................................................................25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc).....................................................................21, 22

*C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*,
2022 WL 16835839 (W.D. Wash. Nov. 9, 2022) ....................................................19, 20

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015)......................................................................................24

*Smith v. Univ. of Washington Law School*,
2 F.Supp.2d 1324 (W.D. Wash. 1998) .......................................................................19

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014).................................................................................18, 19

*Tyson Foods Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ...................................................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................................................19, 21

*West v. Cal. Servs. Bureau, Inc.*,
323 F.R.D. 295 (N.D. Cal. 2017) ...............................................................................18

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

*Zakaria v. Gerber Prod. Co.*,
2016 WL 6662723 (C.D. Cal. Mar. 23, 2016) ....24

**STATE CASES**

*Cohn v. Corinthian Colleges, Inc.*,
169 Cal. App. 4th 523 (2008) ....23

*Harris v. Capital Growth Investors XIV*,
52 Cal. 3d 1142 (1991) ....23

*Jones v. Kehrlein*,
49 Cal. App. 646 (1920) ....22

*Jones v. Kehrlein*,
Cal. App. 646, 651 (1920) ....23

*Koire v. Metro Car Wash*,
40 Cal. 3d 24 (1985) ....22, 23, 24

*Liapes v. Facebook, Inc.*,
95 Cal. App. 5th 910 (2023) ....22, 23

*Rotary Club of Duarte v. Bd. of Directors*,
178 Cal. App. 3d 1035 (1986) ....22

*Suttles v. Hollywood Turf Club*,
45 Cal. App. 2d 283 (1941) ....22, 23

*White v. Square, Inc.*,
7 Cal. 5th 1019 (2019) ....25

**FEDERAL STATUTES**

42 U.S.C. § 274 ....12

42 U.S.C. § 274(b)(2)(B) ....12

**STATE STATUTES**

Cal. Code Civ. Proc. §52(a) ....25

The Unruh Civil Rights Act ....10, 16, 22, 25

**RULES**

Fed. R. Civ. P. 23 ....17, 21

Fed. R. Civ. P. 23(a) ....10, 17, 18, 19, 21

Fed. R. Civ. P. 23(a)(1) ....18

## TABLE OF AUTHORITIES
**(Continued)**

**Page**

Fed. R. Civ. P. 23(a)(2) ....................19

Fed. R. Civ. P. 23(a)(3) ....................19, 20

Fed. R. Civ. P. 23(a)(4) ....................20

Fed. R. Civ. P. 23(b)....................17

Fed. R. Civ. P. 23(b)(3) ....................10, 21, 26

Fed R. Civ. P. 23(g)....................26, 27

**REGULATIONS**

42 C.F.R. § 121.8(a) ....................12

**OTHER AUTHORITIES**

CACI No. 3060 ....................22

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 28, 2026, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Maame Ewusi-Mensah Frimpong, in the United States Courthouse 8B, 350 West First Street, Los Angeles, CA, 90012, Plaintiff Gregory Rowe ("Plaintiff") will and hereby does move this Court for an order granting Plaintiff's Motion for Class Certification (the "Motion"), seeking certification of the following class (the "USC Class"):

- Black USC kidney disease patients who were registered on the national kidney transplant waitlist, from 2000 to the present, that received or would have qualified for a wait time adjustment because a lab test shows that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min, but with a race-neutral calculation it would have been 20 mL/min or less. Excluded from this class is any person filing an individual, personal injury action.

Plaintiff also seeks an order appointing himself as class representative, and Matthew Venezia of Ellis George LLP as lead counsel.

This Motion is made upon the following grounds: Plaintiff challenges USC's discriminatory policy of adjusting Black patients' kidney function scores by using what is known as the race-based coefficient. As explained in Plaintiff's Memorandum of Points and Authorities, and consistent with Supreme Court authority, such a challenge clearly satisfies Rule 23(a). Moreover, Plaintiff satisfies the Rule 23(b)(3) predominance requirement because the proposed classes seek statutory damages under the Unruh Civil Rights Act, and Plaintiff provides a but-for statistical model that can be used to easily identify Unruh violations and calculate statutory damages owed to each class member.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declarations of Dr. Steven Weisbord, Professor David Cutler, Dr. Herbert Lin, Dr. Andrew Sharp, Gregory Rowe, Matthew L. Venezia, and the Request for Judicial Notice, filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

As required by Local Rule 7-3, on February 26, 2026, Plaintiff met and conferred with the Defendants concerning the Motion. Venezia Decl. ¶ 33.

Dated: March 10, 2026

ELLIS GEORGE LLP
Matthew L. Venezia
George B. A. Laiolo
Daniel A. Contreras

By: s/*Matthew L. Venezia*
MATTHEW L. VENEZIA
Attorneys for Plaintiff GREGORY ROWE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This Motion seeks certification of a class of Black USC kidney disease patients challenging the same discriminatory policy at issue in the related *Randall* matter, i.e., USC's adjustment of Black patients' kidney function scores on the assumption they have greater muscle mass. The Supreme Court previously held when considering "a biased testing procedure . . . a class action on behalf of every applicant . . . who might have been prejudiced by the test clearly would satisfy the . . . requirements of Rule 23(a)." *Gratz v. Bollinger*, 539 U.S. 244, 267 (2003).

Contemporaneous documents and testimony from USC's Director of Kidney & Pancreas Transplant prove USC had such a "biased testing procedure" because it used the race-based coefficient both in its lab and to evaluate patients for acceptance into the transplant hospital and placement on the kidney waitlist. This satisfies Rule 23(a). There is also predominance under Rule 23(b)(3) because Prof. Cutler's model—as in *Randall*—allows for straightforward calculation of statutory damages under Unruh, the remedy sought by the proposed class. *Davis v. Lab. Corp. of Am. Holdings*, No. CV 20-0893 FMO (KSx), 2022 WL 22855520, at *8 n.10 (C.D. Cal. June 13, 2022) ("[Defendant] does not challenge predominance under *Comcast* . . . Nor could it since plaintiffs are merely seeking statutory damages under the Unruh Act.").

Nor does this case present any significant management concerns. UNOS and USC maintain detailed records concerning members of the waitlist, and Plaintiff has already identified numerous class members. A review of additional medical records and lab scores that USC stipulated to provide upon class certification will identify the remainder of the class members. And Prof. Cutler's but-for statistical model provides a straightforward method to determine how many Unruh violations each class member suffered.

## II. STATEMENT OF FACTS

### A. Nephrologists create the race-based coefficient, relying on the stereotype that Black people have bigger muscles.

In 1999, Dr. Andrew Levey and his coauthors published the article that created the race-based coefficient, a 21% increase applied only to Black patients' eGFR (estimated glomerular

filtration rate—kidney function) scores. Declaration of Herbert Lin, Ex. 1 (hereinafter, "Lin Report") ¶¶ 18–20. The untested hypothesis proffered in support of this disparate treatment was racial stereotype: "black persons have greater muscle mass than white persons[.]" *Id.* ¶¶ 48–54; Declaration of Matthew L. Venezia ("Venezia Decl.") ¶ 6, Ex. 5 (Greene Depo. at 18:3–17, 20:13–24, 27:2–16, 50:16–20); Venezia Decl. ¶ 7, Ex. 6 (Lewis Depo. 36:23–37:5)). The citations in support of this claim were nonsensical, and two coauthors testified they never even read them. Lin Report ¶¶ 50–54; Declaration of Steven Weisbord (hereinafter "Weisbord Report") ¶¶ 36–45. In other words, the race-based coefficient was not supported by rigorous science. *Id.*; Venezia Decl. ¶ 7, Ex. 6 (Lewis Depo.) at 36:23–37:5, 55:24–56:6; Venezia Decl. ¶ 6, Ex. 5 (Greene Depo.) at 20:13–24, 39:22–40:8, 50:16–20. Nonetheless, relying on Dr. Levey's article, the majority of the nephrology community adopted what is known as the MDRD test, which included use of a race-based coefficient of 21%, as the primary way to estimate GFR scores. Weisbord Report ¶¶ 36, 50.

In 2009, Dr. Levey published an updated test known as the CKD-EPI. *Id.*; Lin Report ¶ 62. This test operated like the MDRD—artificially increasing only Black patients' eGFR scores (by 16% instead of 21%)—again relying on a perceived connection between race and muscle mass. Weisbord Report ¶ 50; Lin Report ¶¶ 63–64. Neither test accurately measures kidney function, and recent scholarship suggests both tests perform better without the race-based coefficient. Weisbord Report ¶¶ 36–45; Lin Report ¶¶ 70–81; Declaration of Andrew Sharp, Ex. 1 (hereinafter "Sharp Report") at 9.

That the race-based coefficient discriminatorily treated Black patients worse without any scientific backing was readily apparent dating back to its creation in 1999. Lin Report ¶ 47. Dr. Herbert Y. Lin, Harvard professor, editor of numerous medical journals, and practicing nephrologist at Massachusetts General Hospital for more than two decades, summarized:

> It is fair to say that I now have the benefit of hindsight; nonetheless, if I were the reviewer of this paper in 1999, I would have rejected the paper based on the sloppy justification for the use of a race-based coefficient. As noted above, I would have been highly troubled by the apparent implication of ugly, centuries-old stereotypes about Black people, with no serious science being offered in support of their hypothesis that Black persons have larger muscles.

*Id.* Moreover, Dr. Sharp, Professor of Genetics and Genomic Sciences at the Icahn School of

Medicine at Mount Sinai, explained that the authors of the race-based coefficient failed to grapple with then-current understandings that race is neither biological nor a medically useful tool. Sharp Report § 3.d. ("[I]t is my opinion that at the time of the creation of [the MDRD and CKD-EPI], established and considerable scientific research cast doubt on the usefulness of race as a biological variable."). In summary, there was never any scientific justification for Defendants' disparate treatment of Black patients by use of the race-based coefficient.[1]

**B. <u>Defendants intentionally discriminated against Black patients for decades by using the race-based coefficient.</u>**

UNOS and USC jointly utilized a policy and practice of using the race-based coefficient. UNOS owns and operates UNet, software that stores candidates' relevant medical information, including eGFR scores, and generates algorithmic "match runs" when donor kidneys become available, ranking waitlist members by their calculated kidney allocation score. Venezia Decl. ¶ 3, Ex. 2 (Brown Depo.) at 47:8–50:2; Ex. 3 (Cartwright Depo.) at 28:2–25. One way patients earn points in their kidney allocation score is wait time, and entry of an eGFR score of 20 mL/min or lower triggers the accrual of wait time in UNet as of the date of the qualifying test. *See* Venezia Decl. ¶ 5, Ex. 4 [OPTN Policies 8.1–8.3]; Weisbord Report ¶ 30.

Despite being contractually obligated to manage the national kidney waitlist and determine the medical criteria for listing, Venezia Decl. ¶ 9, Ex. 8 (UNOS_WELCH_000180); 42 U.S.C. § 274(b)(2)(B), UNOS delegates the listing of patients and entry of medical data into UNet to transplant programs like USC.[2] In so doing, USC required kidney disease patients be on dialysis or have an eGFR score of 20 ml/min or lower before placement on the waitlist. Venezia Decl. ¶ 8,

[1] As early as 2012, The College of American Pathologists described the use of race as a "drawback," in part because of "limited guidance on what to report for mixed-race populations or when to consider an individual as African American or not." Venezia Decl. ¶ 27, Ex. 26 (2012 Estimated Glomerular Filtration Rate (eGFR) and Renal Function article excerpt).

[2] Transplant programs like USC act as UNOS's agent in this regard, UNOS enjoying enforcement power should the transplant programs fail to follow its policies in registering patients, including entry of "Black scores" for Black patients. 42 U.S.C. § 274; 42 C.F.R. § 121.8(a); Venezia Decl. ¶ 9, Ex. 8 (UNOS_WELCH_000180); Venezia Decl. ¶ 10, Ex. 9 (Alcorn Depo. Ex. 6); Venezia Decl. ¶ 36, Ex. 30 (OPTN Policy § 3.4); Venezia Decl. ¶ 12, Ex. 11 (OPTN Management and Membership Policies, Appendix D at 60); Venezia Decl. ¶ 3, Ex. 2 (Brown Depo.) at 136:19–137:04; 145:24–146:08; Venezia Decl. ¶ 11, Ex. 10 (Brown Depo. Ex. 25).

Ex. 8 (Kim Depo.) 77:24–78:3 ("Not on dialysis and not a qualifying GFR less than 20, no, we would not see that in committee."); 78:12–23 ("If a patient was neither on dialysis and they didn't have a  score of 20 or lower . . . that would not meet an indication for transplant.").[3]

To determine whether Black patients met this requirement—indeed, for all purposes—it was USC's policy and practice to use the race-based coefficient until at least mid-2021. Venezia Decl. ¶ 8, Ex. 7 (Kim Depo.) at 27:2–5 ("Q: Is it undisputed that at some point USC used the race-based coefficient for its black patients? A: The race-based coefficient was used in the calculation to report eGFR in the medical record."); 30:8–24 (use of the race-based coefficient when listing Black patients "was what was commonly practiced"); 39:10–19 (Dr. Kim testified, "[f]or the purposes of qualifying people to get on the waiting list for a kidney transplant[,]" USC "stopped that . . . [m]iddle to end of 2021"); Weisbord Report ¶¶ 52–55.

For every Black patient in the agreed-upon sampling, *see* ECF No. 99 (agreeing that pre-class certification USC would produce documents concerning a representative sampling of putative class members), where USC entered an eGFR score into UNet, USC used the race-adjusted score. Weisbord Report ¶¶ 52–55. USC's lab reported eGFR scores using the race-based coefficient until at least July 2022. Venezia Decl. ¶ 13, Ex. 12 (Kim Depo., Ex. 7) (USC lab bulletin, dated July 25, 2022, announced, "USC Clinical Laboratories is removing the race modifier from the eGFR"). *See also* Venezia Decl. ¶ 8, Ex. 7 (Kim Depo.) at 85:15–18 ("Q . . . Do you have any personal knowledge of anyone at USC ever using the race-based coefficient for a white or non-black patient? A: No.").

### C. Defendants admit the discriminatory nature of the race-based coefficient and ban its use.

On June 27, 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient and approved "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function[,]" to go into effect on July 27, 2023. Venezia

---

[3] Dialysis generally begins around 15 ml/min meaning a qualifying eGFR score is the earliest opportunity to be listed. This pre-dialysis listing is commonly referred to as "preemptive listing." Venezia Decl. ¶ 15, Ex. 14 (https://journals.lww.com/jasn/fulltext/2026/03000/racial_and_ethnic_disparities_in_outcomes.15.aspx, last Accessed March 6, 2026).

Decl. ¶ 19, Ex. 18. In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.

*Id*. UNOS workgroups, committees, and also recognized the discriminatory nature of the race-based coefficient. *See* Venezia Decl. ¶¶ 20–22, Exs. 19, 20 & 21.

Similarly, internal discussions at USC criticized the race-based coefficient. Dr. Kim, the Director of Kidney & Pancreas Transplantation at USC, wrote, "this calculation seems to make little scientific sense and supports racial disparity in access to transplant." Venezia Decl. ¶ 14, Ex. 13 (Kim Depo.), Ex. 10. He continued, "For the purposes of kidney transplant candidacy, we should not factor race into our calculations." *Id.*; *see also* Venezia Decl. ¶ 8, Ex. 7 (Kim Depo.) at 20:08–19 (Dr. Kim, in his role as an OPTN committee member, voted in favor of banning use of the race-based coefficient).

**D. <u>UNOS requires transplant hospitals to review records and submit wait time adjustments for impacted patients.</u>**

On January 5, 2023, UNOS announced a new policy requiring transplant hospitals to, by January 3, 2024, "backdate the waiting times of those Black kidney transplant candidates who were disadvantaged by previous use of a race-inclusive calculation to estimate their level of kidney function." Venezia Decl. ¶ 23, Ex. 22. To qualify for a wait time adjustment, a Black patient is required to "provide documentation demonstrating that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min, but with a race-neutral calculation it would have been 20 mL/min or less." Venezia Decl. ¶ 24, Ex. 23.[4] The Black patient's wait time score is then backdated to the date of the qualifying test. *Id.*

Evidencing USC's use of the race-based coefficient, USC was required to submit at least 27

---

[4] On UNOS's press release, one committee member commented, "So many African Americans have been affected by the use of race-inclusive calculations, and have become very ill or have died waiting for the opportunity to list for a kidney transplant[.]" Venezia Decl. ¶ 24, Ex. 23.

wait time requests. Venezia Decl. Ex. 24: Declaration of Dr. David Cutler, Ex. 1 (hereinafter "Cutler Report") ¶ 75. This number includes only those kidney disease patients that were active on the waitlist at USC in 2023, not the large majority of the 542 Black patients USC registered on the waitlist during the class period. Cutler Report ¶ 37. Prof. Cutler estimates there are 216 class members that were listed by USC in addition to class members like Plaintiff that USC never listed because of the race-based coefficient. *Id.*

**E. <u>Defendants' use of the race-based coefficient harmed Black patients.</u>**

Defendants' use of the race-based coefficient delayed Black patients from accruing wait time—as described by UNOS, "one of the most important factors in getting a kidney." Venezia Decl. ¶ 26, Ex. 25. Prof. Cutler created a model intended to measure this harm by creating a but-for world where UNOS's new race-neutral policy was in place from the time the race-based coefficient was created. Cutler Report §§ III–IV. Cutler retroactively implemented wait time adjustments for Black patients receiving or qualifying for adjustments, and re-ran match runs to determine what would have happened if eGFR scores were measured in a race-neutral manner from the beginning. *Id.*

The results are staggering. Cutler analyzed the data using four metrics, and observed the following:

- The average class member would move into the top 7 of the rankings 1.6 times and the top 50 a total of 44.6 times.[5]
- The average class member would move above the person in the match run that actually received the kidney 126 times.
- 41% of class members would move high enough in a match run that it is certain they would be offered a kidney.
- The average class member would be offered a total of 118 additional kidneys.

Cutler Report, Exs. 7 & 8.

**F. <u>The Named Plaintiff.</u>**

On July 26, 2017, Plaintiff saw his new primary care physician at USC, Dr. Carrie Ward, and Plaintiff informed Dr. Ward of his history with kidney disease. ECF No. 38-12 ¶ 3. Plaintiff

[5] These cutoffs were selected because 50% and 75% of kidneys are awarded to those appearing in the top 7 and top 50 of match runs, respectively. Cutler Report ¶ 41.

thereafter visited with USC doctors Antreas Hindoyan and Hui Yi Shan on August 3, 2017, and August 9, 2017, respectively. *Id.* ¶ 7; ECF No. 38-24 ¶ 4; ECF No. 38-24 ¶ 4. Dr. Hindoyan ordered labs for Plaintiff, ECF 38-24 ¶ 9, and labs dated August 3, 2017 reflected an "eGFR AFRICAN AMERICAN" score of 22 alongside an "eGFR NON-AFR. AMERICAN" score of 19. Declaration of Gregory Rowe ("Rowe Decl.") ¶ 9, Ex. 1 (Quest Diagnostics Lab). Plaintiff's eGFR was again measured by USC on August 22, 2017, and considered by Dr. Shan, measuring Plaintiff's "eGFR African American" score at 27 and "eGFR Non African American" score at 23. ECF No. 38-16 ¶ 15 & Ex. 7.

On September 6, 2017, Plaintiff once more saw Dr. Ward. ECF No. 38-12 ¶ 7. At this time, the above-referenced scores were in Plaintiff's medical file. *See* Venezia Decl. ¶ 39, Ex. 33 (Hindoyan Depo. at 36:5–8 ("Clearly this is a test I've ordered from Quest Diagnostics."); Venezia Decl. ¶ 38, Ex. 32. Plaintiff also discussed his desire for a kidney transplant with Dr. Ward. Rowe Decl. ¶ 8.[6] Dr. Ward and Plaintiff's other doctors at USC nonetheless failed to refer Plaintiff to USC's transplant hospital to be added to the kidney waitlist, or initiate any workup as to Plaintiff's suitability for a transplant. This is despite the fact that Plaintiff's non-race adjusted score from August 3, 2017 qualified Plaintiff to join the waitlist.

Because Plaintiff was not listed by USC, he was not added to the waitlist until many years later, on November 30, 2023, by Cedars-Sinai. Venezia Decl. ¶ 16, Ex. 15 (Cedars Nov. 30, 2023 Letter). Plaintiff lost the chance to be considered for donor kidneys between 2017 and late 2023, and even when added to the waitlist, Plaintiff's score was miscalculated, resulting in the Plaintiff losing 18 expected kidney offers. *See* Cutler Report, Ex. 4 (model results for Plaintiff). Plaintiff has diligently assisted counsel in litigating these class claims. Rowe Decl. ¶¶ 3–6.

### G. <u>The Plaintiffs' Claims.</u>

Plaintiff brought claims for intentional, race-based discrimination against UNOS and USC under the Unruh Act. Second Amended Compl. ¶¶ 90–97. At the heart of these claims is the

---

[6] To the extent USC argues this conversation did not happen, Dr. Ward admitted in her deposition that she did not remember what was discussed. Venezia Decl. ¶ 17, Ex. 16 (Ward Depo.) at 37:07–14. Plaintiff, on the other hand, does remember having this conversation with Dr. Ward. Venezia Decl. ¶ 18, Ex. 17 (Rowe Depo.) at 132:11–133:10.

allegation that Defendants violated anti-discrimination laws by calculating kidney function scores differently for Black patients compared to non-Black patients, relying on junk science and racial stereotype, causing Black patients harm. *Id.* ¶¶ 34–43.

### H. The Proposed Class.

Plaintiff moves for certification of the following class against USC (the "USC Class"):

> Black USC kidney disease patients who were registered on the national kidney transplant waitlist, from 2000 to the present, that received or would have qualified for a wait time adjustment because a lab test shows that with a race-inclusive calculation, the candidate's eGFR was over 20 mL/min, but with a race-neutral calculation it would have been 20 mL/min or less. Excluded from this class is any person filing an individual, personal injury action.[7]

## III. ARGUMENT

### A. Legal Standard

Rule 23 is intended "to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). The party seeking to certify a class must show by a preponderance of the evidence compliance with Rule 23(a)'s requirements and at least one of Rule 23(b)'s subsections. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). While the class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," merits questions may only be considered to the extent they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465–66; *see also Milan v. Clif Bar & Co.*, 340 F.R.D. 591, 597 (N.D. Cal. 2021) ("The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits.") (citing *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015)).

### B. Plaintiff satisfies Rule 23(a).

When considering "a biased testing procedure . . . a class action on behalf of every applicant . . . who might have been prejudiced by the test *clearly* would satisfy the . . . requirements of Rule

---

[7] Plaintiff is a putative class member in the California Class in the related *Randall* matter in regard to his claims against UNOS, but does not seek that he be appointed class representative as to his claims against UNOS.

23(a)." *Gratz*, 539 U.S. at 267. In *Gratz*, plaintiffs filed a class action challenging consideration of race in school admissions. *Id.* at 252–53. The Supreme Court affirmed the "carefully considered decision to certify this class-action" challenging a discriminatory policy. *Id.* at 267–68; *see also Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1113, 1116 (9th Cir. 2014) ("the district court erred in denying class certification . . . [t]he question whether the policy has an impermissible disparate impact on the basis of age necessarily has a single answer"). Because Plaintiff challenges the application of a discriminatory policy, the Rule 23(a) factors are easily satisfied.

**1. Numerosity.**

To establish numerosity, Plaintiff must show that "the class is so numerous that joinder of all members is impracticable[.]" Rule 23(a)(1). This factor "requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). "However, proposed classes of less than fifteen are too small while classes of more than sixty are sufficiently large." *Johnson v. City of Grants Pass*, 72 F.4th 868, 886 (9th Cir. 2023), rev'd on other grounds, 144 S. Ct. 679; *see also West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 303 (N.D. Cal. 2017) ("A class or subclass with more than 40 members 'raises a presumption of impracticability [of joinder] based on numbers alone.'") (internal quotation omitted); *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 522 (C.D. Cal. 2012) ("As a general rule, however, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough.") (internal quotation omitted).

Here, since 2000, USC registered 542 Black patients on the kidney waitlist. Venezia Decl., Ex. 31; RJN, at 2. Prof. Cutler's analysis found 39.9% of Black kidney disease patients have straddling eGFR scores such that they are members of the proposed class. Cutler Report ¶ 36. Multiplying the number of Black patients added to the waitlist by 39.9%, Prof. Cutler estimates the putative class to include at least 216 members. *Id.* ¶ 37. This satisfies numerosity, which during the meet and confer process, USC confirmed is not disputed. Venezia Decl., ¶ 33.[8]

---

[8] The total number of class members will be higher because the class includes some kidney disease patients, like Rowe, for which USC's use of the race-based coefficient caused USC to never register the patients.

**2. <u>Commonality.</u>**

To establish commonality, Plaintiff must show "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). The commonality requirement is "construed permissively." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "'Even a single [common] question' will suffice to satisfy Rule 23(a)." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506 (N.D. Cal. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)). "However, Plaintiffs must 'demonstrate that the class members have suffered the same injury,' not 'merely that they have all suffered a violation of the same provision of law.'" *Id.* (quoting *Dukes*, 564 U.S. at 349–50).

Cases challenging discriminatory policies easily satisfy commonality. *See*, *e.g.*, *C.P. ex rel. Pritchard v. Blue Cross Blue Shield of Ill.*, 3:20-cv-06145-RJB, 2022 WL 16835839, at *4 (W.D. Wash. Nov. 9, 2022) (Defendant's refusal to cover gender-affirming care satisfied commonality); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 531 (N.D. Cal. 2012) (allegations of gender-based discrimination in promotions satisfies commonality); *Smith v. Univ. of Washington Law School*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998) (claims alleging racial preferences in law school admissions satisfy commonality). Indeed, in the only case Plaintiff located where a district court refused to certify a class alleging a policy or practice of discrimination for want of commonality, the Ninth Circuit summarily reversed. *Stockwell*, 749 F.3d at 1116 ("the district court erred in denying class certification . . . [t]he question whether the policy has an impermissible disparate impact on the basis of age necessarily has a single answer").

Plaintiff challenges USC's policy of using the race-based coefficient to estimate Black patients' GFR scores, a facially discriminatory policy, like those held to support a finding of commonalty in *Pritchard* and *Smith*. This is sufficient to end the commonality inquiry, but as discussed below in regard to predominance, there are other common issues, including USC's status as a business establishment under Unruh, and Cutler's model for determining statutory damages.

**3. <u>Typicality.</u>**

To establish typicality, Plaintiff must show his claims "are typical of the claims or defenses of the class[.]" Rule 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be

substantially identical." *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Pritchard*, 2022 WL 16835839, at *6 (quoting *A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022)). Rule 23(a)(3) does not require "that all class members suffer the same injury as the class representative." *Lozano v. AT & T Wireless Servs., Inc*., 504 F.3d 718, 734 (9th Cir. 2007).

Here, like in *Pritchard*, Plaintiff satisfies typicality because he encountered USC's policy and practice of using the race-based coefficient. USC used the race-based coefficient to measure Plaintiff's kidney function score, and because of the adjustment, he did not qualify to be referred to USC's transplant hospital or be listed on the kidney waitlist. USC similarly used and relied on the same discriminatory adjustment to hundreds of Black patients' kidney function scores. *Supra*, §§ II.B–C., II.E–F. Plaintiff also suffered the same harm as the other class members: his accrual of wait time was delayed, lessening the chance to be offered donor kidneys. Cutler, ¶¶ 67–74.

**4. <u>Adequacy.</u>**

To establish adequacy, Plaintiff must show his claims "are typical of the claims or defenses of the class[.]" Rule 23(a)(4). In considering adequacy, "two questions are considered: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Pritchard*, 2022 WL 16835839, at *7 (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)).

Here, there are no conflicts between Plaintiff or his counsel and the members of the proposed classes—if the Plaintiff prevails in recovery of statutory damages, that finding will also allow for class members to recover statutory damages. Moreover, Plaintiff and the undersigned counsel have and will continue to prosecute this action vigorously. Plaintiff is an active participant in this matter and is ready and willing to act as a representative for a certified class. Rowe Decl. ¶¶ 3–7. Counsel has invested significant attorney time and hard costs in developing and filing this case, in addition to the related *Randall* matter, opposing motions to dismiss in both cases and a motion for summary

judgment in *Randall*, retaining top experts to provide reports, litigating several discovery disputes successfully, and preparing two motions for class certification, among other things. Venezia Decl. ¶¶ 31–32. Undersigned counsel has extensive experience handling complex litigation, including class actions, and Plaintiff understands from the pre-motion meet and confer discussions that USC does not challenge counsel's adequacy. *Id.* ¶ 33.

**5. Ascertainability.**

As a threshold matter, the Ninth Circuit does not recognize ascertainability as an implicit requirement under Rule 23(a). *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) ("the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification . . ."). Nonetheless, to the extent the Court considers the issue, the class members are easily identifiable.

UNOS and USC maintain detailed medical records concerning members of the national kidney waitlist, and Black waitlist members that received wait time adjustments. Venezia Decl. ¶ 25, Ex. 24. Class members can be identified by reviewing these records for USC patients. *Id.* While only a sampling of medical records were provided to Plaintiff pre-class certification, upon class certification, Plaintiff can easily review medical records for qualifying lab scores. ECF No. 99.

**C. Plaintiff satisfies Rule 23(b)(3).**

Plaintiffs are seeking certification under Rule 23(b)(3) which requires a showing that "common question of law or fact . . . predominate over any questions affecting individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). This case satisfies both tests.

**1. Common questions of fact and law predominate.**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). To prove that "a common question predominates," Plaintiffs "must show that the common question relates to a central issue" of their claims. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc) (citing *Wal-Mart*, 564 U.S. at 349–50). The predominance inquiry under Rule 23(b)(3) is qualitative and "calls upon courts to

give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "[C]onsidering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Olean*, 31 F. 4th at 665 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Nonetheless, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F. 4th at 666–67.

**a. <u>Liability</u>**

Under the Unruh Act, Plaintiff must prove USC is "a business establishment that intentionally discriminates against and/or denies plaintiff[s] full and equal treatment of a service, advantage, or accommodation based on plaintiff's protected status." *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 922 (2023) (Facebook's policy of excluding women and older people from receiving certain ads violated Unruh); *Koire v. Metro Car Wash*, 40 Cal. 3d 24, 35–36 (1985) (discount program for women violated Unruh); *Suttles v. Hollywood Turf Club*, 45 Cal. App. 2d 283, 287 (1941) (policy disallowing Black people entry into a clubhouse "clearly a violation of the statute"); *Jones v. Kehrlein*, 49 Cal. App. 646, 651 (1920) (policy requiring Black people to sit in a segregated section was "illegal and void").[9]

Notably, the CACI jury instructions state that where statutory damages are sought instead of actual damages, as is the case here, "harm is presumed, and elements 3 and 4 may be considered as established[.]" CACI No. 3060, Directions for Use (citing *Koire*, 40 Cal. 3d 24, 33). This requires Plaintiff and the putative class members to prove only that (1) USC engaged is a discriminatory policy or practice, and (2) a substantial motivating reason for USC's conduct was race. *See* CACI No. 3060.

[9] Whether UNOS and/or USC are business establishments is determined by the Court as a matter of law. *Rotary Club of Duarte v. Bd. of Directors*, 178 Cal. App. 3d 1035, 1050 (1986). Nonetheless, this inquiry would consider classwide evidence concerning the nature of the establishments, not individualized inquiries.

Whether USC maintained such a discriminatory policy or practice "is subject to generalized proof[,]" weighing strongly in favor of a finding of predominance. *Ellis*, 285 F.R.D. at 537; *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001) ("common questions, particularly the over-arching question of whether Coca–Cola engaged in a pattern and practice of race discrimination, predominate over individual questions"). Demonstrative of this point, Plaintiff presents uncontroverted evidence USC had a policy and practice of using the race-based coefficient to determine whether its patients were qualified to be accepted into USC's transplant hospital and added to the kidney waitlist. *Supra*, §§ II.B, II.C, II.F (detailing evidence of USC's use of race-adjusted eGFR scores for transplant hospital and kidney wait list qualification).

Similarly, whether the race-based coefficient violates Unruh is subject to generalized proof. *Local 2507, Uniformed EMTs . . . v. City of New York . . .*, No. 22 Civ. 10336 (AT), 2024 WL 4276495, at *4 (S.D.N.Y. Sep. 24, 2024) ("[w]hether the policies that Plaintiffs describe exist and violate federal and state law are questions common to all class members"). Plaintiff will argue the mere use of a racial classification is unlawful and shows the necessary discriminatory intent, consistent with *Liapes*, *Koire*, *Suttles*, and *Jones*. That the race-based coefficient artificially increases only Black persons' kidney function scores without any reasonable justification is subject to common proof. Weisbord §§ A–B.

To the extent USC argues Plaintiff must prove more, some "willful, affirmative" misconduct, citing to *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1148, 1172 (1991), and its progeny, as a threshold matter, that argument fails. *Harris* used that language to explain why disparate impact cases are not cognizable under Unruh, and has been cited in that context, not when considering express racial classifications like the race-based coefficient. *See*, *e.g.*, *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014) (challenging CNN's facially neutral policy of not providing subtitles on its online videos as discriminatory to the hearing impaired); *Cohn v. Corinthian Colleges, Inc.*, 169 Cal. App. 4th 523, 526–27 (2008) (challenging a Mother's Day promotion giving away free tote bags as gender discrimination); *but see Liapes*, 95 Cal. App. 5th at 922 (not citing *Harris* when discussing facially discriminatory policy).

Resolution of this merits argument, however, is premature, and only relevant to tee up the point that even were Plaintiff required to prove USC's state of mind, that would be another issue subject to common proof. *See Broomfield v. Craft Brew All., Inc.*, No. 17-cv-01027-BLF, 2018 WL 4952519, at *13 (N.D. Cal. Sept. 25, 2018) (question of the defendant's "state of mind is . . . common to the class"); *Zakaria v. Gerber Prod. Co.*, No. LA CV15–00200 JAK (Ex), 2016 WL 6662723, at *13 (C.D. Cal. Mar. 23, 2016) (knowledge and intent are "susceptible to common proof" because they "refer only to Defendant's conduct"). Indeed, Plaintiff presents evidence that the race-based coefficient was used because of the racial stereotype that Black people have bigger muscles than White people. Lin Report ¶¶ 23–25; *see also Koire*, 40 Cal. 3d at 35–36 (reasoning that "Ladies' Day" was actionable under Unruh as harmful implication of stereotypes). Further evidence shows that the race-based coefficient became controversial at least a decade before USC stopped using it. Venezia Decl. ¶¶ 34–35, Exs. 28–29.

**b. <u>Damages</u>**

While a class action may be certified on liability alone, with individual proceedings to determine damages, *see Leyva v. Medline Industries Inc.*, 716 F.3d 510, 515 (9th Cir. 2013), a party seeking to prove damages on a classwide basis must demonstrate "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). This requires presenting a damages model that "measure[s] only those damages attributable to" the theory of liability. *Id.* at 35. There is, however, no "requirement that class action plaintiffs actually prove that classwide damages exist in order to obtain class certification." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024). The presentation of a damages model "showing that damages could be calculated on a classwide basis" is sufficient, "even where such calculations have not yet been performed." *Id.* In other words, differences in damages calculations as between class members do not defeat predominance. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014). "To gain class certification, [p]laintiffs need to be able to allege that their damages arise from a course of conduct that impacted the class. But they need not show that each members' damages from that conduct are identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 112 (9th Cir. 2017).

Where a class seeks statutory damages, this is generally sufficient to find predominance. *Davis*, 2022 WL 22855520, at *8 n.10 ("[Defendant] does not challenge predominance under *Comcast* . . . Nor could it since plaintiffs are merely seeking statutory damages under the Unruh Act."); *Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 589 (N.D. Cal. 2018) (holding predominance satisfied and certifying 23(b)(3) damages class where statutory damages sought under Unruh).

Here, Plaintiff proposes certification of a class seeking statutory damages under Unruh. Cal. Civ. Code §52(a) (a defendant violating Unruh "is liable ***for each and every offense*** . . . in no case less than four thousand dollars ($4,000)"). Cal. Civ. Code §52(a) (emphasis added). The class will seek multiple statutory penalties for certain of the class members, because unfair consideration for separate, discrete kidneys qualifies as separate offenses under Unruh, introducing some modicum of required analysis. Notably, to establish an Unruh violation, class members need not prove they otherwise would have received a kidney transplant, only that they encountered a discriminatory policy. *See White v. Square, Inc.*, 7 Cal. 5th 1019, 1026–32 (2019) (collecting cases).

In this regard, Prof. Cutler studied the wait time adjustment data provided by UNOS and created a model showing what would have happened in the match runs if Black patients' GFR scores had not been adjusted using the race-based coefficient. *See generally* Cutler Report. This model provides metrics that can be used to determine the amount of statutory violations for each class member, depending on where the cut is made, as to what constitutes a separate Unruh violation. The model shows the amount of times class members move into the top 7 or top 50 of match runs, the amount of times class members move above the actual recipient of a kidney, the amount of times class members move high enough in a match to be certain to receive an offer on a particular kidney, and the average amount of additional kidney offers a class member would have received, but for use of the race-based coefficient. Cutler Report ¶¶ 49–65. This model has been executed for Plaintiff and those receiving wait time adjustments (*see id.* at Appx. 5), and can be updated to include additional class members upon the location of qualifying lab scores. *Id.* ¶ 35.

The numbers provided in Appx. 5 can simply be multiplied by $4,000 for each class member, using whatever relevant metric is found most appropriate by the trier of fact. Such a straightforward

method to calculate statutory damages on a classwide basis strongly supports a finding of predominance and class certification.

**2. <u>A class action is superior to other available methods of adjudication</u>.**

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023. In conducting this inquiry, the Court may consider the following non-exclusive factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Consideration of these factors makes clear that a class action is the proper procedural mechanism here.

The claims of individual class members are of small enough economic value to make separate cases difficult to fund for the putative class members, and it would be inefficient for each of the thousands of putative class members to try their claims individually. Cutler Report, Appx. 5. Nor will this case interfere with any other litigation, or is there any concern with concentrating these claims in this forum—California federal court is a natural forum for discrimination claims brought against USC. Lastly, there are no likely difficulties in managing this class action. Class members can be identified using medical records maintained by UNOS and USC. Venezia Decl. ¶ 25, Ex. 24. The case can then be tried with the common issue of liability to be determined, and statutory damages measured pursuant to simple arithmetic using the metrics provided by Prof. Cutler.

**D. <u>The Court should appoint Mr. Venezia as lead class counsel</u>.**

"[A] court that certifies a class must appoint class counsel." Fed R. Civ. P. 23(g). The Court must consider:

> (i) the work counsel has done in identifying or investigating potential

> claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

*Id.*

These factors weigh strongly in favor of appointing Matthew L. Venezia of Ellis George LLP as lead counsel. Mr. Venezia is the lead attorney responsible for developing and bringing this class action, in addition to the related *Randall* matter, the first legal challenge to the race-based coefficient. Mr. Venezia and Ellis George LLP committed significant resources to this case, successfully opposing motions to dismiss, conducting 6 depositions to this point, propounding and responding to written discovery (and addressing related discovery disputes), and hiring expert witnesses. Venezia Decl. ¶¶ 31–32. Mr. Venezia and Ellis George LLP are committed to continuing to do the same. Lastly, Mr. Venezia is experienced in both class actions and complex litigation, having obtained noteworthy results in both arenas. *Id.* ¶ 30. Through litigating these kidney discrimination cases, Mr. Venezia has also become well acquainted with relevant anti-discrimination law. *Id.* Plaintiff understands the request to appoint Mr. Venezia as lead counsel will not be opposed.

## IV. CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request that the Court grant the Motion and certify the classes defined herein.

Dated: March 10, 2026

ELLIS GEORGE LLP
Matthew L. Venezia
George B. A. Laiolo
Daniel A. Contreras

By: s/*Matthew L. Venezia*
MATTHEW L. VENEZIA
Attorneys for Plaintiff GREGORY ROWE

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,933 words, which:

☒ complies with the word limit of L.R. 11-6.1.

☐ complies with the word limit set by court order dated ____________.

Dated: March 10, 2026

*s/Matthew L. Venezia*
Matthew L. Venezia

3120518